FOERSTER, INCORPORATED, a Wisconsin corporation, Plaintiff-Appellant-Petitioner,

v.

ATLAS METAL PARTS COMPANY, a Wisconsin corporation, Defendant-Respondent.

Supreme Court

*No. 80–1245. Argued November 3, 1981.—*
*Decided December 1, 1981.*

(Also reported in 313 N.W.2d 60.)

18

For the appellant-petitioner there were briefs by *Irving W. Zirbel, Craig I. Zirbel* and *Zirbel, Howard & Malone, S.C.*, of Milwaukee, and oral argument by *Irving W. Zirbel.*

For the defendant-respondent there was a brief by *Thomas J. Regan, Thomas R. Schrimpf* and *Kluwin, Dunphy, Hankin & McNulty* of Milwaukee, and oral argument by *Mr. Schrimpf.*

COFFEY, J. This is a review of a decision of the court of appeals affirming the judgment of the circuit court for Waukesha county, Hon. JOHN P. BUCKLEY, presiding. The judgment dismissed the amended complaint of the plaintiff-appellant-petitioner, Foerster, Incorporated, holding that it was not a "dealership" as defined in sec. 135.02(2), Stats., and, thus, not entitled to the protections of the Wisconsin Fair Dealership Law when the defendant-respondent, Atlas Metal Parts Company, terminated the existing "Sales Agreement." The appellate court affirmed holding that the conduct of Foerster, Inc., in representing Atlas as a manufacturer's representative did not come within the purview of the definition of "dealership" (sec. 135.02(2), Stats.).

Atlas Metal Parts Company is a Wisconsin corporation engaged in the business of producing metal stampings while Foerster, Inc., is a Wisconsin sales corporation known as a "manufacturer's representative." In June of 1968, Atlas and Foerster entered into a one-year

"sales agreement" in which Foerster agreed to "help promote the sale of contract metal stampings manufactured by Atlas" and Atlas agreed to pay Foerster a commission on all sales Atlas made originating through Foerster's efforts to solicit accounts. The agreement was renewed in writing for another year in 1969 and further extended orally on an annual basis for several years thereafter. The agreement was subject to termination by either party upon written sixty-day notice in advance of the annual termination date. Atlas terminated the agreement effective September 30, 1977, and Foerster challenges this termination as violating the Wisconsin Fair Dealership Law (ch. 135, Stats.).

Atlas supplied Foerster with Atlas advertising brochures and business calling cards, as well as models of its products. Foerster, Inc., was not required to expend any money for advertising Atlas products nor was it required to maintain a supply or inventory of Atlas products. Further, Foerster, Inc., neither paid a fee nor made any investment in Atlas in undertaking the representation agreement. Foerster, Inc., while acting as a manufacturer's representative for Atlas, represented at least four other companies as a manufacturer's representative and in the process of doing so, used a different calling card for each company, in addition to a fifth calling card which identified "FOERSTER, INC." solely as a manufacturer's representative.

Once a Foerster client demonstrated an interest in purchasing Atlas products, Atlas assumed total control of the transaction including the estimating, quoting, acceptance, rejection or approval of all orders, the negotiation of the terms of sales, credit arrangements and assumption of credit risks, along with the responsibility for all collections. Atlas also assumed the responsibility of shipping the orders having Foerster, Inc., do the follow-up work in terms of servicing the customer.

Shortly after Atlas terminated the "sales agreement," Foerster, Inc., brought an action for unpaid sales com-

missions which he alleged were due and owing on sales he solicited prior to his termination. Atlas denied owing any commissions and in its counterclaim, alleged that Foerster had been overpaid on his commissions due to a bookkeeping error over a five year period.

On June 27, 1978, Foerster amended its complaint to seek money damages and equitable relief, alleging that Atlas violated the Wisconsin Fair Dealership Law (ch. 135, Stats.) in terminating the sales agreement. Atlas moved to dismiss the amended complaint for failure to state a claim upon which relief could be granted. The trial court granted Atlas' motion to dismiss and entered judgment dismissing the action. Foerster, Inc., appealed and the appellate court reversed and remanded.[1] On remand, the case was tried to the court and again dismissed, based upon the trial court's determination that Foerster, Inc., was not a "dealership" under the Wisconsin Fair Dealership Law and, thus, not entitled to the protections and relief provided thereby. The court of appeals affirmed the judgment dismissing the action agreeing that Foerster, Inc., was not a "dealership" under ch. 135.

### Issue

Is Foerster, Incorporated, entitled to the protections of the Wisconsin Fair Dealership Law as a "dealership" as that term is defined in sec. 135.02(2), Stats.?

The Wisconsin Fair Dealership Law (ch. 135, Stats.) was enacted by the legislature "for the protection of the interests of the dealer whose *economic livelihood* may be imperiled by the dealership grantor, whatever its size." *Rossow Oil Co. v. Heiman*, 72 Wis. 2d 696, 702, 242 N.W.

---

[1] *Foerster, Inc. v. Atlas Metal Parts*, No. 79–054, unpublished opinion of the court of appeals, dated August 27, 1979. *See:* Table, 91 Wis. 2d 852, 284 N.W.2d 122 (1979). The court reversed the dismissal holding that the trial court had improperly relied on materials outside of the pleadings in granting a motion for judgment on the pleadings.

2d 176 (1976). (Emphasis supplied.) Sec. 135.02(5) defines a "dealer" to whom the protections of ch. 135 are available as "a person who is a grantee of a dealership in this state." A "dealership" is defined by sec. 135.-02(2) in the following manner:

"**Definitions.** In this chapter:

". . .

"(2) 'Dealership' means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise."

It is a well-established rule of statutory construction that it is improper to resort to extrinsic aids for the purpose of statutory construction if the meaning of the statute is clear and unambiguous:

". . . If the meaning of the statute is clear and unambiguous on its face, then resort to extrinsic aids for the purpose of statutory construction is improper." *State v. Derenne,* 102 Wis. 2d 38, 45, 306 N.W.2d 12 (1981).

"A statute, phrase or word is ambiguous when it is capable of being interpreted by reasonably well-informed persons in either of two or more senses." *Wisconsin Bankers Ass'n. v. Mut. Savings & Loan,* 96 Wis. 2d 438, 450, 291 N.W.2d 869 (1980).

Whether a manufacturer's representative is a "dealership" pursuant to sec. 135.02(2), Stats., is a question of first impression in this court. We note, however, that three Federal District Courts in Wisconsin have addressed this issue and, to this date, have not reached a

consensus of opinion.[2] The fact these courts have reached inconsistent conclusions when applying the definition of "dealership" in relatively similar factual situations involving manufacturer's representatives indicates that the statute is capable of being interpreted in two or more ways and, therefore, is ambiguous. Since the definition of "dealership" is somewhat broad and ambiguous when applied to a manufacturer's representative, we resort to legislative history to determine the legislature's intent in enacting this protective legislation.

"When a statute or part thereof is ambiguous, it is permissible to look to the legislative intent which is to be found in the language of the statute in relation to the statute's context, scope, history, subject matter, and object intended to be accomplished. . . ." *Wisconsin Bankers Ass'n. v. Mut. Savings & Loan, supra* at 450.

Ch. 135, Stats., was originally entitled the "Wisconsin Fair Franchising Law." 1973 Assembly Bill, 837A. The bill was subsequently amended to refer to the protected business relationships as "dealerships" rather than "franchises." Assembly Substitute Amendment 1 to 1973 Assembly Bill 837. A letter referred to as an interdepartmental correspondence found in the drafting file of the Wisconsin Legislative Reference Bureau relating to 1973 Assembly Bill 837 indicates that this amendment to the bill was made only to avoid a possible conflict between the bill and the Wisconsin Franchise Investment Law. (Ch. 553, Stats.). Although the term franchise was deleted from the bill, the similarity of the definition of franchise to the definition of dealership as enacted

---

[2] *Al Bishop Agency, Inc. v. Lithonia*, 474 F. Supp, 828 (E.D. Wis. 1979); *E.A. Dickinson & Assoc. v. Simpson Electric Co.*, 509 F. Supp. 1241 (E.D. Wis. 1981); *Wilburn v. Jack Cartwright, Inc.*, 514 F. Supp. 493 (1981), and Wisconsin circuit court decisions cited therein.

makes it clear that the "dealership" definition was intended to define those businesses similar in nature to "franchises."

An indication of the type of business in which the problem was found which the legislature intended to remedy in using the term "dealership" or "franchise" can also be derived from the statements of the bill's sponsor. A press release which accompanied the introduction of the 1973 Assembly Bill 873, includes the following description of the type of businesses the legislation was intended to protect:

"This bill is intended to protect the thousands of small businessmen in Wisconsin who are franchisees. These businessmen operate filling stations, building materials and supply houses, lumber yards, sports equipment stores, motels, hotels and restaurant chains. They sell farm implements, clothing, furniture, and many other types of goods under a franchise system. The intent in this legislation is to protect these Wisconsin businessmen from pressure from a franchisor which is not in their best interest." Press Release, Office of Governor, April 6, 1973.

The description of the businesses which the Fair Dealership Law was intended to cover indicates that the law was meant to protect only those small businessmen who make a substantial financial investment in inventory, physical facilities or "good will" as part of their association with the grantor of the dealership and is, thus, consistent with common or accepted perceptions of the words franchise or dealership. It is these types of businesses whose economic livelihood would be imperiled by the termination of their dealership without good cause and adequate notice. None of the businesses mentioned in this description resembles the type of manufacturer's representative business involved in this case.

The interpretation of the definition of "dealership" as describing business relationships in which the "dealer" makes a substantial investment in terms of inventory

or physical facilities is in agreement with several of the remaining provisions of ch. 135, Stats. Sec. 135.045 provides for the repurchase of inventories from dealers and sec. 135.04 discusses termination of a dealership for nonpayment of sums due under the dealership. Each of these provisions assumes some kind of financial investment on the part of the dealer in securing the dealership, and they are clearly not applicable to the case at bar as Foerster, Inc., did not have an inventory of Atlas products nor did he pay a fee to Atlas for the right to represent them.

In light of the legislative intent underlying the Wisconsin Fair Dealership Act, we proceed to apply the facts of this case to the sec. 135.02(2), Stats., definition of "dealership."

In *Kania v. Airborne Freight Corp.*, 99 Wis. 2d 746, 300 N.W.2d 63 (1981), this court recognized that the definition of sec. 135.02(2), Stats., requires that a business fulfill the following elements in order to be a protected "dealership":

"1. a contract or agreement between two or more persons;
"2. by which a person is granted
   "a. the right to sell goods or services;
   "b. the right to distribute goods or services; or
   "c. the right to use a trade name, trademark, service mark, logotype, advertising or other commercial symbol; and
"3. in which there is a community of interest in the business of
   "a. offering goods or services;
   "b. selling goods or services; or
   "c. distributing goods or services at wholesale, retail by lease, agreement or otherwise." *Id.* at 763.

The parties agree to the existence of a contract, a community of interest and the fact that Foerster, Inc., was not granted the right to distribute goods and services

and, thus, the dispute in this case only concerns whether Foerster, Inc., fulfills two of those elements; namely, is whether Foerster, Inc., was granted the right to sell Atlas' goods and services and/or whether Foerster, Inc., was granted the right to use a trade name, trademark, service mark, logotype, advertising or other commercial symbol.

Addressing first the question of whether Foerster, Inc., was *granted* the right to sell Atlas' products, we note that under the express terms of the sales agreement, Foerster, Inc., was only authorized to "help promote the sale of contract metal stampings manufactured by Atlas." Foerster, Inc., did not keep any inventory of Atlas products and once a client decided to use Atlas products, it was Atlas who undertook all responsibility for quoting, estimating, accepting, denying or approving orders, in addition to negotiating the terms of sales, making credit arrangements and assuming credit risks, along with the responsibility for collecting the purchase price. Thus, Foerster, Inc., has no financial interest in Atlas beyond the promotion of the sale of its products.

This plainly differs from the right to sell found in the types of businesses referred to in the Governor's statement which accompanied the bill quoted earlier. In the case of gasoline service stations or fast food establishments, the right to sell consists of an unqualified authorization to transfer the product at the point and moment of the agreement to sell as contrasted to a more limited right to sell in farm implement dealerships where the right generally includes authority to commit the grantor to a sale and differs from the facts in this case, as here there is no authority to commit the grantor to a sale.

Foerster, Inc's association with Atlas also differs from the common conception of a "franchise" or "dealership" in that Atlas was only one of at least five separate companies which Foerster, Inc., represented. From the facts presented in this case, it is clear that Foerster,

Inc., was not devoting a substantial portion of his business to the promotion of Atlas products and, thus, the corporation's economic livelihood was not dependent solely on his relationship with Atlas. Atlas' termination of Foerster, Inc., as its representative will not result in the decimation of Foerster, Inc., as the corporation still represents four companies. This contrasts considerably with the type of "dealership" intended to be protected in which the entire business is built around and relies on the sale, servicing or representation of one grantor's products, such as gasoline service stations and fast food franchises and it was businesses of this type which the Wisconsin Fair Dealership Law was meant to protect. The termination of Foerster, Inc., as the manufacturer's representative for Atlas does not cause the type of "economic hardship" which arises where 50% to 60% of the business' time is dedicated to the sale of one company's line of products.

We do not agree with the plaintiff's reliance on the holdings of the two reported federal court decisions which have found manufacturer's representatives to be dealerships under sec. 135.02(2). We find them to be factually distinguishable from the case at bar.[3] In *Al Bishop Agency, Inc. v. Lithonia, supra,* the court expressly distinguished the facts of that case from those found in the trial court's decision granting Atlas' motion to dismiss:

"The testimony elicited in Court indicates that plaintiff performed more functions for defendant than Foerster, Inc. performed for its grantor.

"The evidence presented indicates that plaintiff performs the functions of a manufacturer's representative, *i.e.* by encouraging architects and engineers to specify defendant's products. However, plaintiff's responsibilities go far beyond such mere representation. Plaintiff, although it does not bill customers or sell from stock, arranges sales and solicits business from builders and contractors." *Id.* at 831.

---

[3] *Al Bishop Agency, Inc. v. Lithonia, supra,* and *Wilburn v. Jack Cartwright, Inc., supra.*

Likewise, the facts in *Wilburn v. Jack Cartwright, Inc.*, *supra,* are distinguishable from those in this case. In *Cartwright,* the manufacturer's representative was authorized to adjust the price on items purchased and performed credit checks on his customers.

"The defendant's catalogs used by the plaintiff contained prices, but these were substantially inflated; the plaintiff had complete authority to apply specified discount plans according to his assessment of the situation. He usually used one discount plan or another.

". . .

"The plaintiff was generally concerned with the financial condition of his customers, not only for the defendant's benefit, but also his own, since he believed that a sale to a poor credit risk did not reflect well on him. He testified that he performed informal, but exhaustive, credit checks on his customers by asking questions of other customers, representatives and others in a position to know the financial condition of a customer. When he was dealing with a new account, he asked the customer to send the first order to him, and he prepared a memorandum for the defendant detailing the plaintiff's knowledge of the new account."

In this case, Foerster, Inc., did not conduct credit checks on potential Atlas customers nor was the corporation authorized to quote or adjust prices. The record does not demonstrate that Foerster was in any way concerned with the financial condition of a customer, he merely promoted the sale of Atlas products through contacting manufacturers.

The extent of Foerster's involvement in the sale of Atlas products more closely resembles that present in the case of *E.A. Dickinson v. Simpson Electric Company*, *supra,* in which the court found that the plaintiff was not a dealership under sec. 135.02(2), Stats., based in part upon the following findings of fact:

"Plaintiff does not take title to or possession of goods from the defendant, it does not deliver goods from itself or from the defendant to a third party, and it does not exchange goods for a price with any third party. Rather,

plaintiff is paid for its promotional services by the defendant, and the value of the services is measured by a percentage of the price of goods sold by the defendant itself. Nor does the plaintiff distribute goods since it has none in its possession." *Id.* at 1245.

As in *E.A. Dickinson v. Simpson Electric Company, supra,* Foerster, Inc. was merely paid for its promotional services and did not take title or possession of the products sold by Atlas nor did it distribute them. The fact that Foerster, Inc. has no involvement in the actual sale of Atlas products to manufacturers except to promote purchases by customers and service the customers after the sale, along with the clear legislative intent that the Wisconsin Fair Dealership Law apply only to franchises or dealerships which have a more direct involvement in sales compels the conclusion that under the facts of this case, Foerster was not granted the "right to sell" Atlas products.

We next address the question of whether Foerster was granted the right to use Atlas' trade name, trademark, service mark or other commercial symbol as those terms are used in sec. 135.02(2), Stats. Regarding this issue, the record demonstrates that Atlas only provided Foerster with business calling cards and Atlas advertising brochures. The record does not disclose that Atlas ever authorized any use of the Atlas trademark or logo by Foerster, Inc., and it is clear from the record that Foerster, Inc., did not expend any of their own funds advertising Atlas products.

This extremely limited use of the Atlas name and trademark differs considerably from the use made of the grantor's trademark in the typical "dealership" intended by the legislation. In the situation of the service station, fast food franchise, machinery distribution or clothing retailer, the trademark of the grantor or of the dealership is often prominently displayed for several purposes, including as an implicit guarantee of a cer-

tain quality of product and service, frequently support-
ed by the grantor's national or statewide advertising.
While the product may be that of the grantor, the dealer
often uses the trademark to imply that his establish-
ment furnishes the type of quality service associated
with the grantor.

In contrast, Foerster, Inc., used the Atlas logo on busi-
ness cards only for the purpose of informing potential
clients of his status without any notation as to the na-
ture of the relationship. The fact that he was not al-
lowed to adopt the trademark or symbol as his own is
demonstrated by the fact that the card Atlas supplied
to Foerster, Inc., identified Foerster in bold type in the
center of the card with Foerster's phone number and at
the bottom left-hand corner in smaller type identified
Atlas with a separate phone number.

### DON FOERSTER
414 - 786-8506

ATLAS METAL PARTS CO., INC.
1342 PEARL STREET
WAUKESHA, WIS 53186            PHONE: (414) 544-0200

Foerster, Inc., protected its own interests as a separate
and independent business entity through the use of this
calling card and another which identified Foerster, Inc.,
solely as a manufacturer's representative. Additionally,
Foerster, Inc., carried separate calling cards for each of
the other manufacturing firms he represented.

This case differs from the facts in *Wilburn v. Jack
Cartwright, Inc., supra;* in that case the plaintiff ex-
pended his own funds to advertise the manufacturer's

products in his territory, whereas, here, Foerster never advertised Atlas products. *Id.* at 495.

We have noted that the legislative history of the Wisconsin Fair Dealership Law indicates that it was meant primarily to protect businesses whose economic livelihood would be imperiled through the termination of the dealership without adequate notice and just cause, and not individuals, as manufacturer's representatives, who represent several businesses and whose economic livelihood is not exclusively dependent on any one of those businesses. In light of that intent, it is eminently clear that there must be more than the mere use of a calling card identifying a manufacturer's representative as an agent for a company before such representatives are "dealerships," pursuant to sec. 135.02(2), Stats. To the extent that *Wilburn v. Jack Cartwright, supra,* and *Al Bishop v. Lithonia, supra,* imply that the mere use of business cards is sufficient to satisfy the sec. 135.02(2) requirement of a right to use the grantor's trademark, we question those decisions based on the limited facts set out in the opinions.

We hold, therefore, based upon the facts of this case, that Foerster was not granted the right to use the tradename, trademark or symbol of Atlas as provided in sec. 135.02(2), Stats., when Atlas merely provided Foerster, Inc., with calling cards bearing the Atlas logo and identifying Foerster, Inc., primarily as a manufacturer's representative and specifically as a representative of their company, among others.

Our application of the sec. 135.02(2) definition of "dealership" to the facts of this case is consistent with the "common sense approach" which we adopted for construing the definitions of ch. 135, Stats., in *Kania v. Airborne Freight Corp., supra* at 775. In that decision, we quoted favorably the following reasoning of the fed-

eral district court in *H. Phillips Co. v. Brown-Forman Distillers Corp.*, 483 F. Supp. 1289 (W.D. Wis. 1980) :

"[the] direction by the Legislature to the courts to construe and apply the statute [Chapter 135] liberally does not mean that the boundaries of its coverage should be construed expansively. That is to say, the Legislature has acted to protect 'dealers' from 'grantors' rather zealously, particularly with respect to the continuation of 'dealerships.' If a relationship is a dealership, the protections afforded the dealer are to be construed and applied liberally to the dealer. But the statute itself undertakes to draw a line to encompass the kinds of enterprises and relationships which are to enjoy such protection. There is no basis upon which the courts can provide that protection to enterprises and relationships which fall without the legislative line." *Id.* at 1291.

*By the Court.*—The decision of the court of appeals is affirmed.