**LAKEFIELD TELEPHONE COMPANY, Plaintiff,**

v.

**NORTHERN TELECOM, INCORPORATED, Defendant.**

**No. 86–C–0619.**

United States District Court, E.D. Wisconsin.

Feb. 18, 1987.

John W. Markson and William C. Williams, Madison, Wis., for plaintiff.

Stuart Parsons and John A. Casey, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

WARREN, Chief Judge.

This diversity action concerns the claim of plaintiff Lakefield Telephone Company ("Lakefield") that defendant Northern Telecom, Incorporated ("NTI") unlawfully terminated Lakefield's dealership in violation of the Wisconsin Fair Dealership Law, Wis.Stat. § 135.01, *et seq* ("WFDL"). The complaint seeks both injunctive and monetary relief. Lakefield originally filed this action on May 2, 1986, in the Circuit Court for Manitowoc County, Wisconsin, and it was removed by NTI to this Court on June 12, 1986, pursuant to 28 U.S.C. § 1446.

Lakefield previously applied to this Court for a temporary restraining order requiring NTI to continue to do business with Lakefield as a dealer of NTI's products during the pendency of this litigation. Because of this Court's unavailability, the Honorable Myron L. Gordon conducted a hearing on July 9, 1986, and by *Decision And Order* of July 28, 1986, denied Lakefield's requested temporary injunctive relief.

This Court's *Order* of October 3, 1986, ruled that Lakefield could pursue its motion for a preliminary injunction even in the

face of Judge Gordon's denial of Lakefield's requested temporary restraining order. In accordance with that ruling, on October 17, 1986, the Court conducted a hearing on Lakefield's motion for a preliminary injunction whereat it received evidence and heard argument from both parties. By today's *Decision And Order,* the Court grants Lakefield's motion for a preliminary injunction provided that Lakefield post bond in the amount designated below.

## BACKGROUND

Lakefield is an independent telephone company providing local telephone service to areas of Manitowoc County, Wisconsin. Through its Business Systems Division, Lakefield sells telephone "inter-connect systems" for use by businesses. NTI manufactures private branch exchange (PBX) telephone systems used in hospitals, hotels, office buildings and the like. The present litigation centers around NTI's SL-1 PBX system and, more specifically, the nature of Lakefield's right, as granted by NTI, to sell this system to end-user customers.

Most of the pertinent facts defining the parties' business relationship are not in dispute. On March 19, 1984, NTI granted Lakefield a customer number, thereby allowing Lakefield to purchase NTI equipment, including its SL-1 system, and then sell this equipment to third parties. For the following two years, Lakefield bought SL-1 systems from NTI and sold them to end-user customers throughout Wisconsin. Lakefield sold approximately $2 million worth of NTI equipment during this period. Lakefield's agent, Telecom North, aided Lakefield in marketing and distributing the SL-1 system. NTI was aware of this relationship between Lakefield and Telecom North at least as early as July 7, 1984, as evidenced by a letter of this date from Lakefield to NTI revealing this relationship.

A typical SL-1 system sale involved Lakefield and Telecom North representatives meeting with a prospective customer to discuss and define the customer's needs. Although the record is not clear, it appears that pricing decisions were made by the representatives of Lakefield and Telecom North, aided by access to NTI's auto quote pricing system. Upon reaching a sale agreement, Lakefield would issue a purchase order to NTI. NTI would process the purchase order and ship the purchased equipment directly to the end-user customer. Lakefield retained title to the products until their receipt by the customer. Lakefield bore the risk of loss during shipment. Further, Lakefield remained ultimately liable to NTI for the cost of the systems ordered regardless if Lakefield collected from its customers.

## DISCUSSION

The purpose of a preliminary injunction is not to conclude the merits of the controversy, but merely to preserve the status quo until a more considered decision on the merits is possible. *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 264 (7th Cir.1981). The following factors must be present before the Court will issue a preliminary injunction:

(1) Plaintiff has no adequate remedy at law or will be irreparably harmed if the injunction does not issue; [irreparable harm means that the plaintiff is unlikely to be made whole by an award of damages or other relief at the end of trial. *Vogel v. American Soc. of Appraisers,* 744 F.2d 598, 599 (7th Cir.1984)];

(2) The threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant;

(3) The plaintiff has a reasonable likelihood of success on the merits; and

(4) The granting of a preliminary injunction will not disserve the public interest.

*Roland v. Air Line Employees Assn'n Intern.,* 753 F.2d 1385, 1392 (7th Cir.1985); *see also Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 386 (7th Cir. 1984). In determining whether these factors exist, the Court "must make factual determinations on the basis of a fair interpretation of the evidence ..." and "must draw legal conclusions in accord with a principled application of the law." *Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1436 (7th Cir.1986).

### A. Likelihood of Success on the Merits

The parties' respective arguments focus on the issue of whether Lakefield possesses a reasonable likelihood of success on the merits of its cause of action. NTI contends that Lakefield is not a dealer within the meaning of the WFDL and therefore possesses quite dim prospects of ultimately succeeding on the merits. Lakefield argues that NTI has implicitly granted it a dealership within the meaning of, and subject to the protections afforded by, the WFDL.

The following elements must be present in a business relationship before the Court will find that a WFDL recognized dealership exists:

1.  a contract or agreement between two or more persons;

2.  by which a person is granted the right

   a.  to sell goods or services;

   b.  to distribute goods, or services; or

   c.  to use a trade name, trademark, service mark, logo-type advertising or other commercial symbol; and

3.  in which there is a community of interest in the business of

   a.  offering goods or services;

   b.  selling goods or services;

   c.  distributing goods or services at wholesale, retail by lease, agreement or otherwise.

Wis.Stat. § 135.02(3); *Kania v. Airborne Freight Corp.*, 99 Wis.2d 746, 763, 300 N.W.2d 63, 70 (1981). Upon finding that the business relationship constitutes a dealership, the WFDL must be liberally construed to protect dealers against unfair treatment by grantors. Wis.Stat. § 135.-025(1). Such a liberal construction of the WFDL advances its purpose of protecting "those small businessmen who make a substantial financial investment in inventory, physical facilities, or 'goodwill' as part of their association with the grantor of the dealership...." *Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 24, 313 N.W.2d 60, 63 (1981).

In the present case, the parties do not dispute that a contract or agreement existed between them. However, they disagree as to whether NTI granted Lakefield the right to sell or distribute its SL–1 system and, if so, whether there existed a "community of interest" between NTI and Lakefield pursuant to this business of selling or distributing the SL–1 system.

The right to sell or distribute the grantor's goods may vary depending upon the nature of the purported dealer's business. *See Foerster, Inc. v. Atlas Metal Parts Co.*, 105 Wis.2d 17, 26, 313 N.W.2d 60, 64 (1981).[1] In determining whether the right to sell or distribute exists, the Court examines the substance of the parties' business relationship and the plaintiff's rights and responsibilities pursuant to this relationship. Where this examination reveals a conventional employer-employee relationship or a relationship whereby the purported dealer is actually a manufacturer's representative soliciting customers for his employer's products, no WFDL recognized dealership exists. *O'Leary v. Sterling Extruder Corp.*, 533 F.Supp. 1205 (E.D.Wis. 1982); *Quirk v. Atlanta Stove Works, Inc.*, 537 F.Supp. 907 (E.D.Wis.1982).

In the present case, the evidence presented to the Court establishes that Lakefield did possess the right to sell or distribute NTI's SL–1 system within the meaning of the WFDL. Representatives of Lakefield and Telecom North solicited customers for NTI's SL–1 system and negotiated the sale agreements with the customers. To aid Lakefield in these endeavors, NTI assigned Lakefield a customer number and granted Lakefield access to NTI's auto-quote pricing system allowing Lakefield to quickly ascertain suggested prices for NTI's products. The evidence further reveals that Lakefield was authorized to,

---

1. In the case of gasoline service stations or fast food establishments, the right to sell consists of an unqualified authorization to transfer the product at the point and moment of the agreement to sell as contrasted to a more limited right to sell in farm implement dealerships where the right generally includes authority to commit the grantor to a sale....
*Foerster*, 105 Wis.2d at 26, 313 N.W.2d at 64.

and did indeed, enter into binding contracts with end-user customers for the sale of the SL–1 system. Upon entering into such a contract, Lakefield would submit a purchase order with NTI for the equipment. Although the record is not clear whether NTI was obliged to honor every purchase order submitted by Lakefield, there exists no evidence that NTI screened the requests as part of an approval process. Rather, it appears that NTI routinely honored the requests and would ship the ordered equipment directly to the end-user customer. *See Moore v. Tandy Corp., Radio Shack Div.*, 631 F.Supp. 1037, 1047 (W.D.Wis. 1986) (although contract between parties provided that plaintiff's actions were subject to defendant's approval, in actuality plaintiff sold defendant's product without need for defendant's approval). Lakefield took title to the product while it was en route to the end-user customer and it bore any risk of loss that might occur during shipment. Finally, Lakefield was obligated to pay NTI for the purchased SL–1 PBX system regardless if Lakefield ever collected from the end-user customer. That is, Lakefield bore any risk of loss for nonpayment by the end-user customer. Based on all of these factors, the Court finds that Lakefield possessed the right to sell or distribute NTI's SL–1 PBX system to end-user customers.

▮ The Court further finds that, pursuant to their business relationship, the parties shared a sufficient "community of interest" to meet the WFDL criterion. Section 135.02(1) of the Wisconsin Statutes defines a community of interest as meaning "a continuing financial interest between the grantor and grantee in either the operation of the dealership business or the marketing of such goods or services." This definition requires "a shared financial interest" between the parties in the operation of Lakefield's business as to NTI's SL–1 system or the marketing of this system. *See Kania v. Airborne Freight Corp.*, 99 Wis.2d 746, 767, 300 N.W.2d 63, 72 (1981).

Various evidence presented to the Court establishes the community of interest present in the parties' business relationship. In marketing the SL–1 system, Lakefield made an initial investment in inventory of approximately $22,000.00. This investment went towards the purchase of an SL–1 switch, used by Lakefield or Telecom North engineers to simulate and resolve customer problems, and related components to provide emergency servicing to customers. Further, Thomas Nass, manager of Lakefield's Business Systems Division, testified that Lakefield created its Business Systems Division specifically to promote the distribution of NTI products and in 1984 and 1985, Lakefield invested $69,000.00 and $105,000.00, respectively, in this division.

Finally, Lakefield's relationship and interactions with prospective and existing customers reveal the shared nature of the parties' business relationship. At its own expense, Lakefield took prospective customers to NTI's California showrooms and sent customers to NTI's training programs. Further, Lakefield provided training to customers, again at its own expense. Lakefield was also responsible for servicing a customer after a sale. NTI recognized this servicing duty of Lakefield's in its "support letters" to customers which state that NTI will provide all servicing should Lakefield somehow fail to fulfill its servicing obligation. To adequately perform its servicing obligation, Lakefield maintained an office and provided a toll-free calling number for all customers throughout Wisconsin to handle any problems, all at its own expense.

In sum, the Court determines that the parties' business relationship contained a sufficient community of interests to bring this relationship within the ambit of the WFDL.

▮ The Court can quickly dispose of NTI's two other arguments in support of its position that Lakefield does not possess a reasonable likelihood of success on the merits. First, NTI contends that Telecom North, not Lakefield, is the real party in interest and because of this fact, Lakefield will fail to prevail in this litigation. The Exclusive Sales and Marketing Agency Agreement between Lakefield and Telecom

North, dated July 9, 1984, sets forth the nature of their relationship as being one where Telecom North acts as Lakefield's agent in selling and distributing NTI products, and for collection purposes. Mr. Elroy Nass' letter of September 30, 1985, to Mr. Robert J. Potter, Group Vice President of NTI, details Lakefield's reasons for using Telecom North as its agent to aid in distributing NTI's SL–1 system. In this letter, Mr. Nass states that Lakefield desires to use Telecom North's expertise in marketing, installing and maintaining integrated office systems to aid its Business Systems Division in selling NTI's products. The letter further indicates that Lakefield's use of Telecom North as its agent would also be beneficial by serving to divert or preclude regulatory scrutiny by the Wisconsin Public Service Commission.

The Court finds that the nature of the Lakefield-Telecom North relationship would not preclude Lakefield from establishing its status as a dealer of NTI's SL–1 system.[2]

■ Second, NTI contends that the WFDL's one year statute of limitations bars this action. A cause of action under the WFDL accrues upon notice of the dealership's termination. *Les Moise, Inc. v. Rossignol Ski Co., Inc.*, 116 Wis.2d 268, 342 N.W.2d 444 (App.1983). By letter dated February 6, 1985, NTI informed Lakefield that it was not an authorized distributor of NTI's SL–1 systems. However, by letter of April 12, 1985, Mr. C.M. Young, NTI's Vice President of Distributor Marketing, informed Lakefield that NTI would continue selling its SL–1 system to Lakefield under the prior existing terms and conditions between the parties. NTI conditioned this agreement upon there existing a contract between Lakefield and its end-user

customer, and that Lakefield would be "totally responsible for the satisfaction of this customer." Further, the following passage from the April 12, 1985 letter tacitly recognizes Lakefield as an authorized distributor of NTI's products.

> [NTI] does not recognize *Telecom North* as an authorized distributor of our products and will not support their efforts to install and maintain products. *Our only obligation in this regard is to Lakefield Telephone Company.*

(emphasis supplied). The parties continued this business relationship until April 22, 1986, when NTI severely reduced Lakefield's territory in which it could sell the SL–1 system. Shortly thereafter, on May 2, 1986, Lakefield commenced the lawsuit. As such, this action is not time-barred.

## B. Other Preliminary Injunction Factors

As noted above, the focal point of contention between the parties concerns Lakefield's likelihood of success on the merits. The Court, having found that Lakefield possesses a reasonable, indeed a strong, likelihood of succeeding on the merits, will briefly address the other factors which must be present prior to its issuing a preliminary injunction.

Regarding the factors concerning Lakefield's irreparable harm and the balancing of the parties' potential harm, the Court finds that Lakefield will suffer irreparable and substantial harm unless during the pendency of this litigation it were allowed to engage in its previous business of selling/distributing NTI's SL–1 system. In so finding, the Court notes that it must presume irreparable harm where the WFDL has been violated. Wis.Stat. § 135.065. Moreover, a dealership termination that

---

**2.** Further, the following passage from a February 7, 1985 memo authored by NTI's Director of Telco Sales renders disingenuous NTI's argument that the Lakefield-Telecom North relationship is somehow improper:

> I have some concerns over [NTI] picking on this one Telco to prohibit them from reselling products. It is common knowledge among all of us and among many of our Telcos and distributors that so-called "brokering" is rampant throughout the U.S. and, further,

that there are numerous instances where Bell companies and others have offered to pass through [NTI] SL–1s.

> I realize that politically, internally we can probably do nothing about it, ...

> Lacking a cohesive overall evenhanded distribution policy we will continue to see brokering and a plethora of SL–1 multiple bids in the field.

The "one Telco" referred to in this memo is Lakefield.

cuts off product supply may constitute irreparable harm in the form of lost customer goodwill. *Reinders Bros. v. Rain Bird Eastern Sales Corp.*, 627 F.2d 44, 53 (7th Cir.1980). Finally, the Court recognizes that issuing a preliminary injunction will expose NTI to only negligible potential injury since business will be conducted as it was prior to April 22, 1986 and, thus, sales of NTI products will continue in the pertinent territory.

Regarding the public interest factor, the record before the Court indicates that NTI suddenly limited Lakefield's right to sell or distribute the SL-1 system because of pressure exerted by Wisconsin Bell—also a dealer of NTI products—upon NTI to severely restrict Lakefield's territory. A May 8, 1985 letter from Wisconsin Bell to NTI expressed frustration over having to deal with customers Lakefield or Telecom North had also contacted. An NTI internal memorandum shows the same letter with the handwritten note of an NTI executive demanding action in response to Wisconsin Bell's demand. Finally, a June 17, 1985 letter from NTI to Wisconsin Bell begins, "I regret to hear that Lakefield Telephone/Telecom North continues to be a source of frustration." If in fact NTI severely reduced Lakefield's selling territory to assuage Wisconsin Bell's desire for less competition, granting the requested preliminary injunction favors the public interest.

## SUMMARY

For the foregoing reasons, the Court GRANTS Lakefield's motion for a preliminary injunction enjoining NTI from acting to change the competitive circumstances of Lakefield's right to sell or distribute NTI's SL-1 system and requiring NTI to continue to do business with Lakefield under the terms and conditions of its business relationship as it existed prior to April 22, 1986. This Order is conditioned upon Lakefield posting bond in the amount of **$20,000.00,** the amount agreed upon by the parties, should this preliminary injunction later be found to have been improvidently granted.

Finally, to schedule further proceedings in this matter, the Court will hold a brief scheduling conference on *Thursday, March 5, 1987, at 9:45 a.m.*, in Room 390, Federal Building, 517 East Wisconsin Avenue, Milwaukee, Wisconsin.